NO. 8311

COURT OF APPEAL

PARISH OF ORLEANS

--------

ANTHONY HOOK

versus

JACOB CUSIMANO.

8311

--------

--------

June 30/22

H J Stanshay

637

Dinkelspiel; J.

.The issues presented in this case.. which was trans-
ferred to this Court by the Supreme Court of the State. are
as made in the following statement of the Supreme Court:

"Plaintiff sued defendant, his employer, on a con-
tract of employment. for the sum of $2598.99, being commis-
sions on net profits of the business of his employer during
the year 1914. Defendant answered denying all liability.
There was judgment in favor of plaintiff for $974.93 with
interest; and defendant has appealed.

Before the trial of the case, defendant applied to
the Court for the appointment of an expert accountant to ex-
amine his books and make report thereon, which report was
duly filed. Plaintiff did not take the witness stand on
his own behalf; and, after having examined the expert as
his witness, he submitted the case by announcing that he
"offers in evidence the contract of employment; the report
of the special auditor appointed by the court; and the ar-
ticulations of plaintiff's petition; and rests". And the
report showed the amount due plaintiff was $974.93. He
did not offer any further evidence; and the district court
was without authority to render a judgment for a sum in ex-
cess of that amount.

Subsequently, plaintiff was put on the witness
stand and examined as if under cross-examination, and he
willingly admitted that what the expert had said about
the books kept by him as defendant's book-keeper was ab-
solutely correct. And defendant, during the trial of the
cause, said: "I offer in evidence the report of Mr. George
St. Paul, as changed and amended by him, March 26, 1918,
showing the amount of $974.93 as being the amount due
plaintiff herein." And there was judgment as before
stated for that amount in favor of plaintiff.

This case present voluminous statements from the testimony of the experts, George St. Paul and Guy V. W. Lyman, both of whom are expert accountants and who testified in so far as the amount found by both Messrs. St. Paul and Lyman, that same was correct, as the amount due by plaintiff if anything under his contract with defendant, so that to go over the testimony of these two witnesses would be useless and would tend to no good purpose, save and except as reaching the conclusion, these gentlemen reached as experts in an/exhaustive examination of the books of the defendant, and we shall not further allude to their testimony, but ascertain from the evidence of the other witnesses whether the amount claimed by plaintiff in this case found to be due by the experts named is or not correct.

It is contended by the defendant that in connection with the salaries paid his sons, Ben and Jacob Cusimano, together with the salaries paid to others in the employ of defendant, there was or was not bonuses given by the defendant to his son and other employees, which if paid would detract from the amount due plaintiff in this case.

An examination of the witness James Cusimano shows that he is one of the sons of the defendant and that in the report made to the Court by Mrs St. Paul there is a statement entitled "James Cusimano $1800.00.

A. Will you state what that was for? A. Yes, sir, that was compensation to me for my services to the firm.

BY THE COURT: Q. You mean that was your salary or was a gratuity?
A. No, Salary.

Q. Your regular salary? A. Yes sir.

On cross examination.

Q. How were you paid this extra compensation of $1800.00 in cash or by check? A. I was paid this in cash.

Q. At one one time and in a lump sum? A. No sir, I was paid that---that is, at one time I got---borrowed fifteen hundred dollars from my father when I was married.

Q. When were you married? A. In March 1914.

Q. You borrowed Fifteen Hundred Dollars from your father?
A. Yes, sir.

639

Q. How did he give it to you by check or by cash? A. Cash.

Q. From what banks did he draw it? A. I don't know.

Q. What bank did he deposit in at that time? What date was that, and before you answer that question, when were you married? A. March 19th, 1914.

Q. And your father gave you fifteen hundred dollars in cash on what day? A. A couple of days before getting married.

Q. You don't know from what bank he drew that money? A. No, sir. He just gave me the cash.

Q. Who was the book-keeper at that time for your father? A. Mr. Hook.

Q. What did you do with the fifteen hundred dollars your father gave you? A. Well I had to buy furniture and different things when I got married.

Q. How did you get the other three hundred dollars? A. The other three hundred dollars.

Q. Yes? A. I didn't get no other three hundred dollars?

Q. What was your extra compensation for that year?

A. Oh, nineteen hundred, xxkkxxx yes.

Q. What was your compensation for that year? A. You mean all together.

Q. Yes for the year you got married? A. Nineteen hundred dollars.

Q. Then, you got fifteen hundred dollars from your father as a marriage present? A. No, he loaned me the fifteen hundred dollars.

Q. Did you ever pay it back to him? A. Yes sir.

Q. When? A. He drew that against my compensation.

Q. He drew that against your account? A. Yes, sir.

Q. Now when when had that year's work begun for which you were to receive this extra xxx compensation? A. The beginning of 1914.

Q. At the beginning of 1914, and he gave you fifteen hundred dollars in March 1914? A. He loaned me that in 1914.

Q. Did you pay him back? A. He drew three checks against my account, one in June, July and September.

Q. How much were each of these checks? A. Five hundred dollars.

Q. How did you receive the other three hundred dollars
from him? A. In cash.

Q. What was that for? A. Well, I needed it.

Q. When did you receive it from him? A. I don't remember
exactly when I got it from him.

Q. Well approximately what part of the year? A. I couldn't
remember exactly.

Q. Do you know what you did with the three hundred dollars?
A. Oh, I had to live, I had to buy clothes for myself and my
wife.

Q. And you don't know at what particular time it was that
you got it? A. I don't remember what time it was, no sir.
This witnesses goes on to say that his father besides him-
self employed in the office, Mr. Hook, and Mr. Filiberto,
and that each one of these clerks besides getting salaries
were receiving additional compensation, Mr. Filiberto, fif-
teen hundred dollars, he was getting eighteen hundred dollars
and his brother twenty four hundred dollars; plaintiff, Hook
received besides his salary of twenty five dollars a week,
fifteen per cent of the profits; does not know the approximate
amount that his father had aggregated the figures would amount
to.

Q. That's what I want to get at, In other words, xaxxfxkxxx
your father gave you as a clerk twenty-five hundred dollars
a year? A. Yes sir.

Q. And he gave your brother twenty nine hundred dollars a
year? A. Yes, sir.

Q. He gave Mr. Filiberto twenty five hundred dollars a year
and he kept his bookkeeper at twenty-five dollars a week
A. And fifteen per cent of the profits.

Q. And you say he didn't think that would amount to anything?
A. I say, I think he didn't know what the profits would be.
No one could tell what the profits would be at the end of
the year.

Q. Now, how did you secure your compensation for 1913 from
your father? A. I am telling you.

Q. No, you are not.

A. I am telling you, if he loaned me that compensation and then takes---I mean, if he loaned me the fifteen hundred dollars in March, 1914, then, instead of paying me my compensation of 1914, he kept that against what I owed him.

Q. For 1914? A. No for 1913.

Q. Then what were you paid for 1914? A. I only drew nine hundred dollars against my credit for 1914.

Q. How did you receive the balance of that credit? A. I didn't receive it, it is to my credit yet.

Q. It is still to your credit? A. The balance of eighteen hundred dollars.

Q. How much of the balance? A. Nine hundred dollars.

Q. Thats for 1914? A. Yes.

Q. And how much was your compensation for 1915? A. I didn't get any, my salary was increased in 1915.

Q. To how much? A. Thirty Five Dollars.

Q. What did you get in 1916 in the shape of extra compensation? A. None.

Q. What did you get in 1917? A. None.

Q. What was your salary in 1917? A. Well, our place burned down in 1917.

Q. What was your salary in 1916? A. My salary was brought down to thirty dollars.

Q. Is the business still running now? A. Yes sir.

Q. What is your salary now? A. Forty dollars.

Q. It went up to forty dollars? A. Yes, sir.

Q. How much have you got to your credit with Cusimano & Company? A. I have nothing to my credit.

Q. You have nothing, I thought you said you still have nine hundred dollars? A. Oh, well thats the old business, against my compensation you mean.

Q. How much is to your credit with Cusimano & Company? A. Nine hundred dollars.

Q. And you have never drawn against that? A. Not yet.

Q. Why not? A. Because I don't need the money.

642

Q. Then you have gone along during the last three years on thirty five dollars a week, thirty dollars a week, and now forty dollars a week? A. Yes sir.

Q. And the nine hundred dollars is still there untouched by you? A. Yes sir.

Ben Cusimano after giving his name, stating that he is was a xxxxxfxdxf son of defendant, that he worked at his place, worked as foreman upstairs, and that he was thirty years old, further testified:

Q. Your name appears in the report of Mr. St. Paul herein as being entitled, in addition to your weekly salary, to compensation in lump sum of $1800. Did you receive all or any part of that $1800? A. I received all of it, and not having a bank account, I turned it over to my father and took it as I wanted it.

Q. You actually received all of that eighteen hundred dollars? A. Yes, sir.

Q. How was that $1800 paid to you? A. All at once.

Q. In what way, by check or cash? A. By check.

Q. What did you do with the check? A. Turned it over to my father.

Q. How did you get the cash then? A. Well I took it out as I wanted it in cash money, any time I needed it I asked him for it and he turned it over to me when I needed it.

Q. How many times did he make payment to you of this $1800? A. Well, one of five hundred dollars

Q. What did you do with the five hundred dollars. A. What did I do with it? Q. Yes--don't repeat my questions. What did you do with it? A. I spent it.

Q. How? A. Foolish.

Q. What did do, you call foolish? Explain that. A. Well, I spent the first $500 foolish and the rest I invested and lost.

Q. In what did you invest it? A. I don't remember what I invested the last.

Q. How did he pay you the $500? A. In check.

Q. What did you do with that check, go to a bank and cash it? A. Yes sir.

Q. What bank? A. The Commercial Germania Bank.

Q. You endorsed the check and presented it? A. Yes.

Q. What other sums did you receive from your father?
A. A thousand dollars was the other check? Q. How did you cash it? A. By check.

Q. You went to the bank xnaexshex and cashed it and dfx drew a thousand dollars? A. Yes.

Q. What did you do with the thousand dollars? A. What did I do with the thousand dollars? Q. What did you do with it? Counsel for defendant interposed and this occurred.

Mr. Marinoni: What thousand dollars do you refer to?

By Mr. O'Connor: The thousand dollars he says his father gave him/

By the Court:

Q. Can't you answer the question? A. Yes.

Q. Well answer it and we will save time? A. Well, I loaned most of it out.

Q. To whom? A. Friends.

Q. Name the friends? A. One of them is Joe Leonis of New York City.

Q. Do you know his address? A. No, I haven't received a letter in six months.

Q. How much of the thousand dollars did you loan to Joe Leonie of New York City, whose address you don't know? A. Five hundred dollars.

Q. Did he ever pay you back? A. No.

Q. Did you get a note from him on that? A. No.

Q. You just loaned it to him? A. Yes sir.

Q. What did you do with the other five hundred dollars?

By the Court:

The witness is an intelligent witness. If you don't know what you did with it, say so.

Then asked by his counsel, Mr. Marinoni:

Q. Are you married? A. No.

By the Court:

Q. You can't answer that question? Do you know what you did

with the other five hundred dollars?

A. (No answer).

Q. If you don't remember, say so? A. I don't remember that.

Q. And you swear the additional compensation was $1800.00.

A. (no answer)

By the Court:

Answer the question.

A. Mr. Marinoni made a mistake when he said $1800.

Q. How much was your additional compensation? A. Twenty-four hundred dollars.

Q. Then, you have accounted for eighteen hundred dollars. How did you receive the additional six hundred dollars? A. The same way.

Q. What do you call the same way, by check or cash? A. By check.

Q. What did you do with the additional six hundred dollars?

A. Why, I spent most of the money.

Q. In what way? A. Buying things.

Rudolph J. Derbes, a witness says substantially that he was first employed about December 1913 by Mr. Cusimano; he is an expert accountant and licensed public accountant.

Q. Did Mr. Cusimano give you any instructions in reference to any entries to be made in the accounts of 1913? A. Yes, sir.

Q. Now state what that was?

A. Well, one particular instruction was either directly or through Mr. Hook, to make entries for two salaries, yearly salaries, as far as I can remember, $1500 each for his two sons. Now, I knew at the time that they had drawn their weekly salary, and I got the impression that it was only put on the books in order to reduce the profits, to reduce the income tax.

Objection was made as to witness's impressions and the objection was sustained.

Q. Now, state why you believed that; state the facts.

A. Because the salaries having been drawn weekly and the profits appearing surprisingly large, they were, as far as I can remember, reduced by those two entries. Now, I discussed that at the time, and I said: "If you are going to"___

Q. You discussed it with whom? A. Mr. Cusimeno and Hook.

Q. Did you discuss it with Mr. Cusimano himself? A. Yes.

Q. Now, go ahead and state what you discussed.

A. I said: "If you are going to put those salaries on the books, you have to pay them; you can't put any fictitious entries on the books"; and six months after I met Mr. Hook and asked him if they were paid----.

Q. Do you know whether they were paid or not?

A. Well, subsequently, I don't know.

Q. Did you work for defendant in 1914? A. I worked in about March, I think.

Q. Now was there anything said then about bonuses?

A. No, at the time of making the entry I made that remark, that if they were put on the books, they would have to be paid.

Q. What was the character of the conversation that led to that? What did Mr. Cusimano say to you? What did you say to him? A. He transmitted the instructions to me to put it on the books, I think, through Mr. Hook, because he never would talk to me. But he was present, he would not speak to me because I was deaf.

Q. Now, then state to the Court what was the object of the conversation, what was the subject of the conversation. What were you all driving at? What were you trying to accomplish?

A. I remarked:"If you are going to put salaries on the books, after salaries have been paid weekly, it appears to me as though it is not a bona fide salary; you have got to pay them, and, if you want to put them on the books, you better pay them".

By the Court:

Q. What did he say to that?

A. Well, Mr. Cusimano didn't answer, but he just simply led me to believe it would be paid. Be made no answer to my statement at all.

Q. You were instructed to make entries? A. Yes.

Q. Why were you instructed to make them? A. To close the books for the year 1913. The income tax was discussed at the time.

I don't remember what was said, but discussing the income tax and the closing of the books, I was instructed to put two salaries on the books, which, I think, are $1500; I don't remember if it was twelve or fifteen hundred, but something like that. I said "Thats all right, so far as it goes, but you have to pay them; I am going to put these salaries on the books, but, if I do, you have to pay them; I don't want any fixtitix fictitious entry"; and no answer was made that I remember now to that statement of mine.

Q. What I wanted to know from you at the time you were so instructed to make those entries, what was the discussion?
A. The discussion was to reduce the profits for the income.
Q. The discussion you say was to reduce the profits for the income tax? A. Yes, but now who brought the subject up, I can't say positively, but Mr. Hook spoke about it and I spoke about it and Mr. Cusimano spoke about it and it seems as though that entry was a result of that discussion. After stating the facts at the time, I have completely forgot all about it. In other words, I didn't want to be putting entries on the books that would be fictitious, and I so stated.

The testimony of the defendant, together with that of the plaintiff would throw no further light upon this intricate subject. From the testimony of the two sons, employees of the defendant, together with statements of conversation had between plaintiff, defendant and Mr. Derbes, we are convinced that the bonuses or additional salaries sworn to by the defendant and his sons, giving credit to the testimony of these parties interest in this case as far as it is possible so to do, that if the amounts paid to the sons by the father were correct, it must have been in the nature of a gratuity or otherwise, and not as compensation in addition to the salaries received by them, and therefore, we conclude xhxx cannot be charged to the plaintiff in this case, in order to reduce the profits of the business as shown by the xxxxxkxkxkx experts in this case.

647

His honor, the Judge of the lower Court had these witnesses all before him and after a careful investigation of the whole matter at issue, came to the conclusion that the amount as fixed by the experts due plaintiff was the correct sum. He ~~hasxmixhadxxhexwitnessesxbeforexhim~~ was in a better position to see from their actions their conduct, together with their testimony, to decide the issues presented here, than we are, and we conclude that all the circumstances surrounding this case, that his decisions was correct.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment of the Court a quo be and the same is hereby affirmed at the cost of defendant in both Courts.

-Judgment affirmed.